SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

DAVID A. CASTLEMAN AS RECEIVER FOR　　　　　:
EMINIFX, INC.,　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　Plaintiff,　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　v.　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
INTERACTIVE BROKERS LLC,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　Defendant.　　　:

-------------------------------------------------------------------X

Index No.

Date Purchased:

**SUMMONS**

**To the Defendant:** Interactive Brokers LLC
One Pickwick Plaza
Greenwich, Connecticut 06830

YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your answer, or, if the Complaint is not served with this Summons, to serve a notice of appearance, on the Plaintiff's attorneys within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Plaintiff designates New York County as the place of trial pursuant to CPLR § 503(a) and (b), because the Receiver was appointed by the Honorable Valerie E. Caproni, a justice of the United States District Court, Southern District of New York, 40 Foley Square, New York, New York 10007, located in New York County and/or the events or omissions giving rise to the claims occurred in New York County.

Dated: New York, New York
　　　　December 3, 2024

**OTTERBOURG P.C.**

By: */s/ William M. Moran*
　　　William M. Moran
　　　Jennifer S. Feeney
　　　Alessandra M. Dagirmanjian

230 Park Avenue
New York, NY 10169-0075
Tel: (212) 661-9100
wmoran@otterbourg.com
jfeeney@otterbourg.com
adagirmanjian@otterbourg.com

8230153.1

Case 1:25-cv-00042-VEC    Document 1-1    Filed 01/02/25    Page 2 of 26

*Attorneys for Plaintiff David A. Castleman as Receiver for EminiFX, Inc.*

8230153.1

Case 1:25-cv-00042-VEC   Document 1-1   Filed 01/02/25   Page 3 of 26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
DAVID A. CASTLEMAN AS RECEIVER FOR       :
EMINIFX, INC.,                            :
                                          :          Index No.
                        Plaintiff,        :
                                          :          **COMPLAINT**
            v.                            :
                                          :
INTERACTIVE BROKERS LLC,                  :
                                          :
                        Defendant.        :
-------------------------------------------------------------------X

Plaintiff David A. Castleman (the "Receiver"), solely in his capacity as Receiver for

EminiFX, Inc. ("EminiFX"), as and for his Complaint against Interactive Brokers LLC ("IBKR")

alleges on knowledge as to his own status and actions, and otherwise upon information and belief,

as follows:

## NATURE OF THE ACTION

1.      The Receiver was appointed by the Honorable Valerie E. Caproni of the United

States District Court, Southern District of New York.  On May 11, 2022, the Commodity Futures

Trading Commission (the "CFTC") filed a civil complaint in the action styled *Commodity Futures

Trading Commission v. Alexandre et al* (11-cv-03822) (the "CFTC Action") against Alexandre

and EminiFX based on allegations, generally, that EminiFX was operated by its leadership as a

Ponzi-like scheme.

2.      The authority of the Receiver, as more fully discussed below, includes the power

to remove the former chief executive officer of EminiFX, Eddy Alexandre ("Alexandre"), as well

as all other officers, from control and management of the affairs of EminiFX.  It also includes the

mandate to prevent loss, damage or injury to any customers or clients of EminiFX, and the power

to commence suit to preserve or increase the value of the Receivership Estate for the ultimate benefit of the customers of EminiFX.

3.       The Receiver has carried out the removal of all previous EminiFX leadership, has taken control of the business, and hereby commences the instant action against IBKR to recover damages solely for the benefit of the customers of EminiFX.  Importantly, the Receiver has eliminated all wrongdoers from any possibility of any recovery from the instant action, all of which will be overseen by the United States District Court for the Southern District of New York.

4.       The Receiver sues IBKR herein for recovery solely for the benefit of the customers of EminiFX, because when IBKR approved Alexandre's deposits of millions of dollars into his personal account in December 2021 and January 2022—most of which were subsequently lost— IBKR knew the deposited funds were from the customers of EminiFX.  Further, IBKR either knew or should have known from the due diligence and investigation it undertook that EminiFX was being run as a Ponzi scheme.

5.       Tens of thousands of individuals who deposited money into EminiFX have been harmed by the wrongful actions and inaction of IBKR which knowingly enabled and substantially assisted Alexandre to unlawfully deposit more than $9 million of EminiFX investor funds into his personal account at IKBR. Alexandre then lost more than $7 million of those funds through wildly risky investments on IBKR's trading platform, as well as through IBKR's own negligence.

6.       Alexandre pled guilty to commodities fraud in the criminal action captioned *United States v. Eddy Alexandre*, No. 22 Cr. 326 (JPC).  As set forth in the Complaint in the Criminal Action, Alexandre and EminiFX solicited investments from unsuspecting investors who became customers of EminiFX in a so-called "investment club" (the "Customers") totaling over $260 million.  Alexandre added the funds from that single class of investors into a pool of commingled

2

Case 1:25-cv-00042-VEC    Document 1-1    Filed 01/02/25    Page 5 of 26

funds, using the same pool of funds to satisfy over $30 million in investor withdrawals. Upon information and belief, over 35,000 people invested in EminiFX.

7. Beginning in December 2021 and continuing into January 2022, Alexandre transferred at least $9 million of Customers' deposits from EminiFX to his personal bank accounts. Within days of the transfers from EminiFX, Alexandre transferred deposits of these funds into his personal account at IBKR, which IBKR then approved for investing: first a deposit of $1 million on December 30, 2021; then $2 million on January 12, 2022; then $6 million on January 26, 2022. Alexandre had opened that same account on October 14, 2019, but before the deposits beginning in December of 2021, he made only sporadic deposits, generally between $10,000 to $20,000. The largest single deposit prior to the first $1 million deposit was only $35,000 in March 2020. The total cash in that account on November 30, 2021 was $3,215.54.

8. At the same time that IBKR approved these out-of-the-ordinary deposits into his personal account, Alexandre applied to open an IBKR corporate account for EminiFX. Alexandre specifically informed IBKR on January 4, 2022 that he intended to fund his corporate account with $10 million. Once IBKR began to undertake its duty to perform due diligence into the company, IBKR questioned Alexandre's application for EminiFX. In a message on January 21, 2022, IBKR specifically noted Alexandre's description of EminiFX as "an investment club," and stated that the basic information provided about the company was insufficient.

9. Notwithstanding its specific knowledge about Alexandre's corporate account, IBKR approved $9 million in December 2021/January 2022 deposits into Alexandre's personal investment account despite knowing that the money was from the Customers of the EminiFX "investment club." IBKR knew this because Alexandre told IBKR this. Alexandre told IBKR that

3

these deposits were intended to fund the prospective EminiFX account at IBKR that Alexandre was simultaneously trying to open.

10.     Any meaningful due diligence or investigation into EminiFX would, or should have, uncovered that EminiFX promised potential participants that their contributed funds would be invested in cryptocurrency and foreign exchange trading, and that they would receive guaranteed weekly returns of at least 5%, on any amounts contributed to EminiFX. Those types of outsized returns, between 1,164 % to 14,037 % per year, would have been perceived as nonsensical to any investment professional at IBKR. As such, IBKR had discovered, or should have discovered, that EminiFX was being operated as Ponzi scheme.

11.     IBKR approved these deposits of EminiFX Customer funds into Alexandre's personal account, even though those deposits and Alexandre's subsequent trading were radically divergent from Alexandre's use of his personal account up to that time.

12.     Indeed, IBKR permitted Alexandre to make wildly risky trades that were a core component of the Ponzi scheme, because the only possible way to make anywhere near the promised returns was to make highly risky trades that had a small chance of paying off even if they were unlikely to result in a profit. IBKR knew or should have known about those promises because of the due diligence it conducted on EminiFX when it rejected the corporate account. And in fact those very trades, focused on highly risky options, did not result in a profit but instead resulted in the massive losses that caused harm to the Customers.

13.     Finally, despite knowing that Alexandre was trading with EminiFX Customer money, and even acknowledging in March of 2022 that Alexandre's trading activity was "of a type that may draw scrutiny from exchanges and/or regulators," IBKR carelessly froze certain of

4

Alexandre's option positions, supposedly to evaluate them for compliance, resulting in further accumulated losses of the EminiFX Customer funds in Alexandre's account.

14.     Thus, IBKR knowingly, recklessly and negligently enabled Alexandre to squander Customers' funds through poor investment decisions and then negligently froze Alexandre's positions, ultimately resulting in losses of investor funds of more than $7 million.

15.     On July 6, 2022, all that was left for the Receiver to recover for the Customers from Alexandre's personal IBKR account was $1,752,994.40.

16.     By the time the Receiver was appointed to take over EminiFX, the total losses in EminiFX (excluding any promised profits) totaled $55,397,380, according to the Financial Condition Report filed by the Receiver in the CFTC Action.

17.     The Receiver now brings this action on behalf of the Customers to recover damages solely for the benefit of the Customers, who have been harmed by IBKR's wrongful actions.

## THE PARTIES

18.     On May 11, 2022, in the CFTC Action Judge Caproni entered the Statutory Restraining Order (the "SRO") [Dkt. 9] which, among other things, appointed the Receiver as the Temporary Receiver for EminiFX and for "all customer funds and property and other assets traceable to customers in the possession of or under the control of Eddy Alexandre."  On June 15, 2022, the Court entered the Consent Order for Preliminary Injunction (the "Consent Order") [Dkt. 56], which appointed David A. Castleman as the permanent Receiver for EminiFX and its affiliates or subsidiaries owned or controlled by EminiFX, and incorporated the terms of the SRO.  The Receiver's appointing court, the Receiver's principal place of business and the principal office of the Receivership are each located in New York County, New York.

5

8230153.1

19.     EminiFX is a New York corporation, currently under receivership before the Court in the CFTC Action.  EminiFX's principal office was moved to 31 West 34th Street, 8th Floor, New York, NY 10001 some time in December 2021.  During the relevant timeframe, EminiFX's CEO, Alexandre, resided in Valley Stream, New York, which is also the legal or principal address of EminiFX.

20.     IBKR is a limited liability company and financial institution providing brokerage services, including to residents in New York state.  Alexandre's use of his personal Interactive Brokers account was governed by one or more customer agreements with IBKR.  IBKR is, upon information and belief, organized in Connecticut and has its principal place of business in Greenwich, Connecticut.  IBKR has also been found by a federal court in New York to reside in New York.  *Allen v. Fid. Brokerage Servs. LLC*, 711 F. Supp. 3d 219, 221 (S.D.N.Y. 2024) ("As all parties agree, [Interactive Brokers LLC] is a citizen of New York.")

## JURISDICTION AND VENUE

21.     This Court has personal jurisdiction over defendant IBKR, pursuant to CPLR § 302(a) because IBKR (1) "transacts" and at all relevant times has transacted "business within the state or contracts" and has at all relevant times contracted "anywhere to supply . . . services in the state"; and/or (2) as set forth herein, "commit[ed] a tortious act within the state"; and/or (3) as set forth herein, has "commit[ed] a tortious act without the state causing injury to person or property within the state", and "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from . . . services rendered, in the state, or . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."

22. Venue is proper in New York County, pursuant to CPLR § 503(a) and (b), because the Receiver was appointed by a federal court sitting in New York County, and/or as described herein, the events or omissions giving rise to the claims occurred in New York County.

## **FACTUAL ALLEGATIONS**

### **The Operation of a Ponzi Scheme through EminiFX**

23. EminiFX was established in or about September 2021 as a "multi-level" investment club, which accepted deposits from the Customers in the form of cash and cryptocurrency.

24. Alexandre solicited prospective participants to contribute to the "investment club" through the EminiFX website, weekly Zoom webinars, in person meetings and events, and through a network of promotors on YouTube and other social media. The largest audience of Alexandre and those assisting him was the Haitian community in the United States, although participants were not limited to that community.

25. Upon information and belief, Alexandre misled the prospective participants from the very beginning. Indeed, according to the EminiFX website, participants could build wealth "with investments in the crypto and forex trading business by signing on with EminiFX." The EminiFX website also touted its "Robo-Advisor Assisted account" that allowed for "automated trading."

26. Alexandre promised potential EminiFX participants that they would receive guaranteed returns of at least 5% "every single week," on any amounts contributed to EminiFX. In fact after Customers created and funded accounts with EminiFX, each Friday their online accounts showed that the Customers' balances increased by between 5% and 9.99% over the prior week.

27.     The increasing account balances for the Customers gave the impression that Alexandre was profitably trading the Customers' contributions. This was false. The vast majority of Customers' contributions were not traded, but rather were kept in EminiFX's bank and cryptocurrency accounts at Bank of America and TD Bank, spent by Alexandre, transferred to others, or transferred to accounts in the name of Alexandre, including at IBKR.

28.     Alexandre hired numerous individuals to serve as members of Senior Management at EminiFX.  These individuals comprised roles at EminiFX such as Chief Financial Officer, Senior Vice President of Client Relations, Senior Vice President of Business Development, Chief Customer Officer, and Regional Director, to name a few.  Upon information and belief, these individuals were involved because not only did they give EminiFX access to their contacts within the Haitian communities, but they also enabled the company to tout itself as being comprised of mostly people of Haitian descent.

29.     Upon information and belief, while some in Senior Management may have had knowledge of the fraud in addition to Alexandre, others did not.  For this reason, the movement of the EminiFX Customer funds, including from EminiFX accounts to Alexandre's accounts and elsewhere, were shielded from the knowledge of some in Senior Management positions, who upon further information and belief would have interfered with the fraud had they known.

30.     While it was still operating, EminiFX received over $260 million in contributions from Customers into a pool of commingled funds.  These contributions were moved into an account at Bank of America, which was frozen around March of 2022, and in an account at TD Bank, as well as in an offshore Coinpayments system.

31.     The same pool of funds was used to satisfy withdrawals by Customers, which totaled over $30 million.

8230153.1

32.     Customers were allocated returns of between 5.00 and 9.99 percent every week (the equivalent of 1,164 % to 14,037 % annually) that were not based on any actual investment activity, while existing Customers were motivated to bring in new Customers through the award of commission bonuses.

33.     Of the $260 million in contributions from Customers, only a total of about $14 million of EminiFX Customer funds were actually invested (all at a loss).  As set forth below, most of that $14 million was misappropriated by Alexandre from EminiFX to invest through IBKR.

34.     Since his appointment, the Receiver has secured and liquidated over $150 million in assets of EminiFX, which were funded solely by Customer contributions.  The Receiver's Team has analyzed tens of thousands of claims of Customers for the sole purpose of making distributions of those funds back to them.

**IBKR Knowingly Enables Alexandre to Trade with Misappropriated EminiFX User Funds**

35.     Between December 23, 2021 and January 26, 2022, Alexandre transferred approximately $9,010,000 from corporate accounts of EminiFX to his personal account at TD Bank.  In December of 2021 IBKR began approving deposits into Alexandre's personal investment account at IBKR U***1114 (the "Alexandre IBKR Account"), as set forth below:

| IBKR ACCOUNT FUNDING | | | |
|---|---|---|---|
| Date | Transfer from EminiFX Account to Alexandre TD Account | Transfer from Alexandre TD Account to IBKR Account | Cumulative Amount to Alexandre IBKR Account |
| 12/23/2021 | $          325,000 | | $                  - |
| 12/23/2021 | $          700,000 | | $                  - |
| 12/30/2021 | | $       1,000,000 | $        1,000,000 |
| 12/31/2021 | | $            10,000 | $        1,010,000 |
| 1/11/2022 | $       1,000,000 | | $        1,010,000 |
| 1/11/2022 | $       1,000,000 | | $        1,010,000 |
| 1/12/2022 | | $       2,000,000 | $        3,010,000 |
| 1/24/2022 | $       6,000,000 | | $        3,010,000 |

9

| 1/26/2022 | | $ 6,000,000 | $ 9,010,000 |
|---|---|---|---|
| 1/31/2022 | | $ 10,000 | $ 9,020,000 |
| 2/28/2022 | | $ 10,000 | $ 9,030,000 |
| 3/31/2022 | | $ 10,000 | $ 9,040,000 |

36.     Even though Alexandre deposited these funds into his personal account, by January 24, 2022, IBKR knew that the funds it approved for deposit into Alexandre's personal account were EminiFX Customer funds – because Alexandre told it as much.

37.     As early as October 2021, Alexandre attempted to open a separate, corporate account for EminiFX with IBKR.  That account was initially assigned No. U***5199 by IBKR, but with an overall AML Risk Ranking of 2 (entered in red) and a status of "Rejected."  When Alexandre tried to deposit $150,000 of EminiFX funds into that account in October 2021, that deposit request was not accepted, and expired on December 6, 2021.

38.     Alexandre opened his personal IBKR account two years earlier on October 14, 2019 which, before the deposits made in December of 2021, had sporadic deposits generally between $10,000 to $20,000.  Before December 2021 the largest single deposit to that account was for $35,000 in March of 2020.  The total cash in that account at the beginning of December 2021 was about $3,000.  But on December 30, 2021, Alexandre funded the Alexandre IBKR Account with $1 million – at the very same time that his application to open the corporate account for the EminiFX "investment club" was being vetted by IBKR, and only a few weeks after his attempt to deposit the $150,000 into his corporate account expired.

39.     Just five days later, on January 5, 2022, Alexandre emailed IBKR, from his EminiFX email account, stating:

> Hello new accounts department,
>
> I would like to get access back to my new CORPORATE [U***5699] account to **complete the funding** with over ten millions dollars.

Case 1:25-cv-00042-VEC    Document 1-1    Filed 01/02/25    Page 13 of 26

Please help me find my username so I can reset my password.

My Family Advisor account is [F***1937]
and my personal account is [U***1114]

Ex. 1 (emphasis added).

40.     He specified in that message that he intended "to *complete* the funding" for the corporate account, signifying that the funding he had started on December 30, 2021 (that atypical $1 million deposit that was approved by IBKR) was intended for the corporate account, and that there would be more to come.

41.     On January 5, 2022, IBKR responded to Alexandre's email, explaining that his application for a corporate account was insufficient, and additional information was still needed including very basic information about EminiFX.  IBKR specified that it required: (1) proof of existence for EminiFX; (2) proof of principal place of business address for EminiFX; (3) proof of authorization to open a MRGN Account; (4) proof of authorization to open a Margin Account; (5) proof of identity and date of birth for Alexandre; and (6) proof of address for Alexandre.  Ex. 2.

42.     That same day, IBKR also requested that Alexandre complete a questionnaire, concerning a business description for EminiFX.  Ex. 3.

43.     Yet just days later, on January 12, 2022, IBKR permitted Alexandre to fund the Alexandre IBKR Account with an additional $2,000,000—another very atypical amount.

44.     On January 21, 2022, IBKR again informed Alexandre that his application for a corporate account was deficient, because he failed to provide proof of the principal place of business address for EminiFX, or proof of authorization to open a margin account, and specifically stated:

After further compliance review, it has been noted that you have entered \*EminiFX **is an investment club** educating its userbase about taking advantage of the market\* as your business description. Please reply back to this email with a detailed nature

11

of the business description (e.g. daily operations, services, products, strategies, reason for formation, etc.).

Exhibit 4 (emphasis added).

45.     Thus, it was clear to IBKR that Alexandre described EminiFX as an "investment club" with a "userbase" at the same time IBKR approved deposits into his personal investment account in very large amounts that diverged from all previous activity in that account, which Alexandre specifically referred to when he requested access to the new corporate account to "complete" the funding of that corporate account.

46.     As such, IBKR knew that Alexandre was using the Alexandre IBKR Account for EminiFX Customer funds.  Further, IBKR had a duty to safeguard the EminiFX Customer funds which were deposited into Alexandre's personal account.

47.     But rather than doing so, just five days later on January 26, 2022, IBKR approved for investment Alexandre's additional deposit of $6,000,000 (to "complete the funding" of the "new CORPORATE [U***5699] account") into his personal IBKR Account. And as set forth above, the subsequent investments by Alexandre resulted in massive losses.

48.     Thus, in the course of less than a month, IBKR substantially assisted Alexandre to deposit more than $9 million of EminiFX Customer funds into the personal Alexandre IBKR Account, and then to lose most of it.

49.     IBKR not only ignored Alexandre's admission concerning his intent to "complete the funding", as well as other red flags, and permitted Alexandre to squander millions of dollars of EminiFX Customer funds on radical trades—it also allowed Alexandre to open additional accounts as a financial advisor on behalf of other third parties at IBKR, even though Alexandre was not a licensed financial advisor or broker.

12

50.  Specifically, Alexandre managed and made trades for account numbers: U***0337, U***3512, U***3967, U***7891, U***9428, U***9245, U***3834, U***8058, and U***1114 using his own IBKR "financial advisor" account, account number F***1937.

51.  Clearly, IBKR did not abide by its legal and compliance responsibilities, nor its own internal policies.

## The Alexandre IBKR Account Suffers Substantial Losses

52.  Alexandre's investments in the Alexandre IBKR Account after the deposits of Customer funds became very risky and were a radical departure from previous investments. In fact, once the first $1 million was deposited into that account, the account value decreases began to mount almost immediately.

53.  In January 2022, the account incurred substantial decreases in marked to market account value, with almost $4.6 million lost. About $2.8 million of that loss was the result of trading E-Mini futures on index funds, with another $1.8 million lost from trading a combination of stocks and options—the most significant trades being long call options on Ford Inc. combined with shorting the same stock, a combination that alone resulted in a loss of over $1.2 million. Given IBKR's due diligence investigation into EminiFX, IBKR knew or should have known that the risky, volatile, and unsuccessful trading by Alexandre in January 2022 was consistent with a radical investment pattern aimed at trying to approach the outsized returns EminiFX had promised.

54.  For the week ending February 18, 2022, the account value increased nearly $1 million, but then declined another $800,000.00 in March and again another $800,000.00 in April.

55.  The substantial decline in March was also due to the negligent acts of IBKR when it froze certain option positions in the Alexandre IBKR Account, which resulted in the rapidly declining value of out-of-the-money options expiring in the near term.

13

Case 1:25-cv-00042-VEC   Document 1-1   Filed 01/02/25   Page 16 of 26

56.     Specifically, on March 22, 2022, Alexandre emailed IBKR stating that "[m]y account has been restricted, I could not rollover my positions and had to exit losing quite a lot of money." Ex. 5 at 5-6.

57.     But rather than protect from further losses and confront Alexandre with his unlawful conduct, IBKR later responded with a message that merely suggested his unlawful conduct may be detected:

> During a routine review of your account we noticed that certain recent trading activity in your account(s) may be of a type that may draw scrutiny from exchanges and/or regulators. Please provide, via IBKR Message Center, a brief explanation for the following trades, placed on the dates indicated, in your account(s). Please include a summary of the strategy or intent behind these transactions and if you know the counter party to these trades.

Ex. 5 at 3-5.

58.     Alexandre's response, which was or should have been a red flag to IBKR that he lacked the necessary sophistication to be trading in the amounts that IBKR allowed, was as follows:

> The trades below as you sent them were made in an uncalculated move to take advantage of the underlying instruments price appreciation notwithstanding the costs (premium) paid to acquire the options resulting in a fractional loss.
>
> I have no idea who the counterpart is since I got the options on IBKR and only trade the options on IBKR.
>
> Let me know what else you need from me to close that case. I am losing money on deals I cannot rollover not adjust with the restrictions. I was about to close all the positions.

Ex. 5 at 3.

59.     The losses from IBKR's freezing the options amounted to millions of dollars.

60.     After running even from May 1 through May 9, a substantial decline in the UPST stock caused a loss of over $1.2 million on May 10, 2022 alone.

14

61.     By the time the Receiver was able to secure the Alexandre IBKR Account and liquidate it, its marked to market value had lost over $7.2 million, or about 80% of the total amount of EminiFX funds deposited into it.

### IBKR's Substantial Assistance in Alexandre's Scheme

62.     IBKR recklessly enabled Alexandre to continue to perpetuate the Ponzi scheme, significantly harming the Customers by deteriorating the assets, when IBKR knew or should have known that Alexandre was depositing EminiFX Customer funds into his personal account, and helped him to continue doing so.

63.     During the course of its due diligence into EminiFX when Alexandre tried to open the corporate account, IBKR knew the company was an "investment club" that involved Customer money.  Moreover, Alexandre admitted to IBKR that the funds being deposited into his personal account in December 2021 and January 2022 were intended to "complete the funding," potentially up to $10 million for the corporate account.

64.     During the course of its due diligence into EminiFX when Alexandre tried to open the corporate account, as described above, IBKR knew or should have known that EminiFX was being operated as a Ponzi scheme.

65.     IBKR, as a financial institution, had legal and compliance requirements, including but not limited to the anti-money laundering laws under the banking laws and the "know your customer rule" under the securities laws, as well as its own internal compliance procedures, that required IBKR to ensure that Customers' funds were not unlawfully traded and lost in Alexandre's personal investment account.

66.     IBKR's substantial assistance to Alexandre in continuing his fraud resulted in losses to EminiFX of millions of dollars as of May 13, 2022.  Ex. 6 at 60.

8230153.1

67.    IBKR must not be allowed to escape its liability.

**The Authority of the Receiver**

68.    The authority of the Receiver is set forth in the terms of the SRO issued on May 11, 2022 by Judge Caproni in the CFTC Action.  The specific terms of the SRO provided as follows[1]:

30.    David A. Castleman is appointed Temporary Receiver, with the full powers of an equity receiver for Defendant EminiFX, Inc. and its affiliates and subsidiaries owned or controlled by Defendant EminiFX, Inc. and all customer funds and property and other assets traceable to customers in the possession of or under the control of Eddy Alexandre (hereinafter referred to as the "Receivership Defendants"), and of all the funds, properties, premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants (hereinafter, the "Receivership Estate"). The Temporary Receiver shall be the agent of this Court in acting as Temporary Receiver under this Order. The Temporary Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers, managing members, and general and limited partners of the Receivership Defendants under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 & 1692, and Fed R. Civ, P. 66.

31.    The Temporary Receiver is authorized to accomplish the following:

a.    Assume full control of the Receivership Defendants by removing Defendants Eddy Alexandre and EminiFX, Inc., and any officer, independent contractor, employee, or agent of the Receivership Defendants, from control and management of the affairs of the Receivership Defendants as the Temporary Receiver deems appropriate;

b.    Take exclusive custody, control, and possession of the Receivership Estate, which includes but is not limited to complete authority to sue for, collect, receive, and take possession of all goods, chattels, furniture, office supplies and equipment, rights, credits, money, financial accounts of any kind (including but not limited to bank, checking, savings, brokerage, cryptocurrency or similar) effects, land, leases, books, records, work papers, and records of accounts, including electronically-stored information (including but not limited to all computers, laptops, hard drives,

---

[1] The SRO was later converted to a Preliminary Injunction, entered on June 15, 2022, and expressly incorporated Paragraph 31.

16

external storage drives, and any other such memory, media or electronic storage devices), contracts, financial records, funds on hand in banks and other financial institutions, certificates of deposit, stocks, bonds, debentures, mortgages, and other securities and investments, cryptocurrency stored in any form, and other papers and records of the Receivership Defendants and customers or clients of any of Receivership Defendants' business activities whose interests are now held by, or under the direction, possession, custody, or control of, the Receivership Defendants;

c.      Take all steps necessary to secure the business and other premises under the control of the Receivership Defendants, including but not limited to premises located at 31 W. 34th St., New York, NY;

d.      Perform all acts necessary, including the suspension of operations, to conserve, hold, manage, and preserve the value of the Receivership Estate in order to prevent an irreparable loss, damage, or injury to any customers or clients of any of Receivership Defendants' business activities;

e.      Prevent the withdrawal or misapplication of assets entrusted to the Receivership Defendants, and otherwise protect the interests of any customers or clients of any of Receivership Defendants' business activities;

f.      Manage and administer the Receivership Defendants and the Receivership Estate by performing all acts incidental thereto that the Temporary Receiver deems appropriate, including hiring or dismissing any and all personnel, suspending operations, and/or entering into agreements, including but not limited to: (1) the retention and employment of investigators, attorneys or accountants, appraisers, and other independent contractors and technical specialists of the Temporary Receiver's choice, including without limitation members and employees of the Temporary Receiver's firm, to assist, advise, and represent the Temporary Receiver; and (2) the movement and storage of any equipment, furniture, records, files or other physical property of the Receivership Defendants;

g.      Open all mail directed to or received by or at the offices or post office boxes of the Receivership Entities, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order; and Instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations or activities of any of the Receivership Entities (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entities.

h.      Collect all funds owed to the Receivership Defendants;

i.      Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to, any actions or proceedings in state, federal, or foreign court that the Temporary Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate or that the Temporary Receiver deems necessary and advisable to carry out the Temporary Receiver's mandate under this Order;

8230153.1

Case 1:25-cv-00042-VEC    Document 1-1    Filed 01/02/25    Page 20 of 26

j.      Issue subpoenas to obtain records and testimony pertaining to the Receivership and conduct discovery in this action on behalf of the Receivership Estate;

k.      File this Order and any necessary accompanying documents in any judicial district of the United States pursuant to 28 U.S.C. §§ 754 & 1692;

l.      Open one or more bank accounts and deposit all funds of the Receivership Estate in such designated accounts and make all payments and disbursements from the Receivership Estate from such accounts;

m.      Take all necessary steps to obtain any required tax identification numbers and to file tax returns and pay all tax liability for Defendant EminiFX, Inc; provided that the Receiver shall not be required to file tax returns for Defendant Eddy Alexandre;

n.      Make payments and disbursements from the Receivership Estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, provided that the Temporary Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except for payments that the Temporary Receiver deems necessary or advisable to secure the Receivership Estate from immediate and irreparable loss;

o.      Create and maintain a website for communications with investors in EminiFX and update the website as appropriate to provide information to investors to the activities and condition of the Receivership Estate; and

p.      Maintain written accounts itemizing receipts and expenditures, describing properties held or managed, and naming the depositories holding funds or other assets of the Receivership Estate; make such written accounts and supporting documentation available to the Commission for inspection; and, within sixty days of being appointed and periodically thereafter, as directed by the Court, file with the Court and serve on the parties a report summarizing efforts to marshal and collect assets, administer the Receivership Estate, and otherwise perform the duties mandated by this Order.

69.     Pursuant to these specific terms, the Receiver took all necessary steps required to "assume full control of the Receivership Defendants" and did in fact "remov[e] Defendants Eddy Alexandre and EminiFX, Inc., and any officer, independent contractor, employee, or agent of the Receivership Defendants, from control and management of the affairs of the Receivership Defendants," which effectively prevents any of the Ponzi-scheme wrongdoers from benefiting from any recovery the Receiver achieves.

8230153.1

18

70.     Pursuant to these specific terms, the Receiver has authority not just over EminiFX, but also over "all customer funds and property and other assets traceable to customers in the possession of or under the control of Eddy Alexandre (hereinafter referred to as the "Receivership Defendants"), and of all the funds, . . . now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants (hereinafter, the "Receivership Estate")." As such, the Receiver was specifically bestowed with full authority over the EminiFX Customer funds that were approved as deposits into Alexandre's personal IBKR account.

71.     This authority bestowed upon the Receiver also explicitly includes the power to "[t]ake exclusive custody, control, and possession of the Receivership Estate, which includes . . . [the] complete authority to sue for . . . all . . . rights, credits, money, financial accounts of any kind (including but not limited to . . . brokerage . . .), . . . funds on hand in banks and other financial institutions . . . and other securities and investments . . . and other papers and records of the . . . customers or clients of any of Receivership Defendants' business activities whose interests are now held by, or under the direction, possession, custody, or control of, the Receivership Defendants," to "[i]nitiate. . . any actions or proceedings in state, federal, or foreign court that the [] Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate or that the [] Receiver deems necessary and advisable to carry out the [] Receiver's mandate under this Order," which mandate includes the authority "to prevent an irreparable loss, damage, or injury to any customers or clients of [EminiFX]."  As such, the Receiver was bestowed with full authority to sue IBKR for the benefit of the innocent Customers, to whom any recovery of damages will be paid by the Receiver.

19

72.     The Receiver has filed a proposed distribution plan with the Receivership Court, under which the vast majority of the Receivership Estate would be distributed to Customers. That proposed plan remains *sub judice* as of this filing. The Receiver expects that the vast majority of the Receivership Estate (including any recovery from this matter) will, in the end, be distributed to Customers.

## FIRST CAUSE OF ACTION
### (Gross Negligence)

73.     Plaintiff realleges and reincorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

74.     IBKR knew that the funds Alexandre invested in the Alexandre IBKR Account were funds that belonged to EminiFX. As set forth above, at the same time that Alexandre deposited more than $9 million into the Alexandre IBKR Account, and at the same time that Alexandre told IBKR the funds were "to complete the funding" of the "new CORPORATE [U***5699] account," IBKR sent Alexandre emails rejecting his application to open an account for EminiFX, which IBKR knew from its due diligence investigation that Alexandre had described in his application as an "investment club" with a "userbase."

75.     In March of 2022, IBKR acknowledged in an email to Alexandre that his trading activity was "of a type that may draw scrutiny from exchanges and/or regulators." Ex. 5.

76.     IBKR therefore knew or should have known that Alexandre was misappropriating millions of dollars from EminiFX accounts into his personal account at IBKR and, especially after seeing his radical trading activity resulting in substantial losses, that such actions would substantially harm EminiFX and its Customers.

77.     IBKR, which has a duty to investigate when it has specific facts or knowledge that would lead an ordinary financial institution to do so, was in the best position to prevent this by

8230153.1

20

reporting Alexandre or preventing Alexandre from trading with EminiFX Customer funds deposited into the Alexandre IBKR Account. However, upon information and belief, IBKR did nothing to prevent Alexandre's misappropriation.

78.     As a direct result of IBKR's breach, EminiFX suffered damages, in an amount to be calculated at trial, of not less than $7,287,055.60, plus interest, costs and attorneys' fees.

## SECOND CAUSE OF ACTION
### (Negligence)

79.     Plaintiff realleges and reincorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

80.     IBKR knew, or at the very least, should have known that the funds Alexandre invested in the Alexandre IBKR Account were funds belonging to Customers. As set forth above, at the same time that Alexandre deposited more than $9 million into the Alexandre IBKR Account, IBKR sent Alexandre emails rejecting his application to open an account for EminiFX, which Alexandre described in his application as an "investment club," and Alexandre sent IBKR emails referencing his efforts to "complete the funding" of the corporate account, which was being carried out in his personal account.

81.     IBKR therefore knew or should have known from its due diligence investigation that Alexandre was misappropriating millions of dollars from Customers and depositing the same into his personal account at IBKR.

82.     IBKR, which has a duty to investigate when it has specific facts or knowledge that would lead an ordinary financial institution to do so, was in the best position to protect the EminiFX Customer funds deposited by Alexandre into the Alexandre IBKR Account by reporting Alexandre, or preventing Alexandre from trading with funds deposited into the Alexandre IBKR Account. But IBKR failed to do so.

83.     Further, IBKR carelessly froze options in Alexandre's account that IBKR knew or should have known would result in massive accumulated losses of the funds misappropriated from Customers.

84.     As a proximate result of IBKR's breach, EminiFX and the Customers suffered damages in an amount to be determined at trial, not less than $7,287,055.60, plus interest, costs and attorneys' fees.

## THIRD CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

85.     Plaintiff realleges and reincorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

86.     Alexandre served as Chief Executive Officer of EminiFX.  As CEO, Alexandre owed fiduciary duties to EminiFX, including duties of care and loyalty, as well as to the Customers.

87.     Alexandre's misappropriation of at least $9 million of EminiFX User funds from EminiFX, and loss of about 80% of those funds, through radical and volatile investments in an Interactive Brokers account, constituted a breach of his fiduciary duties to EminiFX and the Customers.

88.     Alexandre further breached his duties to EminiFX and its customers by operating the company as a Ponzi scheme and taking in no actual profit, which resulted in massive losses to EminiFX over the course of months.

89.     IBKR had actual knowledge that the funds Alexandre invested in the Alexandre IBKR Account were funds belonging to Customers: as set forth above, at the same time that Alexandre deposited more than $9 million into the Alexandre IBKR Account, and at the same time that Alexandre told IBKR the funds were "to complete the funding" of the "new CORPORATE [U***5699] account," IBKR sent Alexandre emails rejecting his application to open an account

for EminiFX, which IBKR knew from its due diligence investigation that Alexandre had described in his application as an "investment club" with a "userbase." IBKR knew from its due diligence investigation of EminiFX and from Alexandre's wildly unsuccessful trading in January 2022 that Alexandre was operating EminiFX as a Ponzi scheme.

90.    IBKR therefore knew that Alexandre was misappropriating millions of dollars from Customers and depositing the same into his personal account at IBKR.

91.    IBKR also knew that Alexandre owed a fiduciary duty to EminiFX as its officer, because Alexandre attempted to open a corporate account for EminiFX, and as part of his application, Alexandre provided several documents making clear that he was an officer or director of EminiFX, including a certificate of incorporation of EminiFX, identifying Alexandre as its "incorporator." Ex. 7 at 6.

92.    Yet, IBKR assisted Alexandre in his fraud by enabling him to continue depositing funds for the radical investments in the Alexandre IBKR Account.

93.    Thus, as a result of IBKR's actions, which aided and abetted Alexandre's breach of fiduciary duties, the Alexandre IBKR Account saw losses totaling approximately $7,287,055.60, plus interest and costs.

94.    The total losses in EminiFX (excluding any promised profits) totaled $55,397,380, according to the Financial Condition Report filed by the Receiver in the CFTC Action.

WHEREFORE, Plaintiff respectfully requests judgment as follows:

A.    On the First Cause of Action, awarding in favor of Plaintiff and against Defendant, damages for Gross Negligence, in an amount not less than $7,287,055.60, plus interest, costs and attorneys' fees;

8230153.1

B.      On the Second Cause of Action, awarding in favor of Plaintiff and against Defendant, damages for Negligence, in an amount not less than $7,287,055.60, plus interest, costs and attorneys' fees;

C.      On the Third Cause of Action, awarding in favor of Plaintiff and against Defendant, damages for Aiding and Abetting Breach of Fiduciary Duty, at a minimum in an amount not less than $7,287,055.60 plus punitive damages, interest, costs and attorneys' fees.

D.      Awarding Plaintiff such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        December 3, 2024

                                        **OTTERBOURG P.C.**

                                        By: */s/ William M. Moran*
                                              William M. Moran
                                              Jennifer S. Feeney
                                              Alessandra M. Dagirmanjian

                                        230 Park Avenue
                                        New York, NY 10169-0075
                                        Tel: (212) 661-9100
                                        wmoran@otterbourg.com
                                        jfeeney@otterbourg.com
                                        adagirmanjian@otterbourg.com
                                        *Attorneys for Plaintiff David A. Castleman as Receiver for EminiFX, Inc.*